## CHICAGO, B. & Q. R. CO. v. BLUNT.

(Circuit Court of Appeals, Eighth Circuit.  June 30, 1913.)

### No. 3,902.

**1. TRIAL (§ 191*)—INSTRUCTIONS—ASSUMPTION OF FACT.**

Where evidence that one who was suing for personal injuries had made a false claim for a pension for injuries received while in the army, and an affidavit in support of the petition was admitted, but it did not conclusively appear in the testimony that the plaintiff had done anything more than write to the maker of the affidavit and request him to make an affidavit as to the facts, a requested instruction that the United States statute in force at the time the plaintiff procured the affidavit punished the procuring of a false affidavit was erroneous, as taking from the jury the right to determine whether the plaintiff did in fact procure the making of an affidavit, even though that clause was simply preliminary to the main part of the instruction.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 420–431, 435; Dec. Dig. § 191.*]

**2. TRIAL (§ 191*)—INSTRUCTIONS—ASSUMPTION OF FACTS.**

Where the second part of the same instruction told the jury that, if they found that the plaintiff knowingly aided in making any false affidavit for the purpose of procuring a pension, they might consider that fact in determining his credibility, that part was erroneous, taken in connection with the first part, where there was no evidence that the plaintiff procured any other affidavit than that offered, and which the instruction told the jury he had procured.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 420–431, 435; Dec. Dig. § 191.*]

**3. TRIAL (§ 252*)—INSTRUCTIONS—CREDIBILITY OF WITNESS.**

The requested instruction was also erroneous, where there was no evidence that the affidavit was false, since Rev. St. § 4746 (U. S. Comp. St. 1901, p. 3279), punishes the procuring or making of a false affidavit, not the use of an affidavit which is not false in support of a false claim for pension.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 505, 596–612; Dec. Dig. § 252.*]

In Error to the District Court of the United States for the District of Nebraska; Thomas C. Munger, Judge.

Action by Jesse F. Blunt against the Chicago, Burlington & Quincy Railroad Company.  Judgment for the plaintiff, and defendant brings error.  Affirmed.

Herman Aye, of Omaha, Neb. (Byron Clark and A. R. Wells, both of Omaha, Neb., on the brief), for plaintiff in error.

Matthew Gering, of Plattsmouth, Neb., for defendant in error.

Before SANBORN and CARLAND, Circuit Judges, and WILLARD, District Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CARLAND, Circuit Judge. Blunt sued the railroad company to recover damages for personal injuries received in March, 1908. At the trial it appeared that Blunt had, prior to his alleged injury, made two applications for a pension on account of disability resulting from injuries received in the line of duty as a soldier in the army of the United States. One application was made in 1905, and the other in 1907. At the trial there was evidence tending to show that the applications, in so far as they stated that Blunt was by reason of said injuries greatly disabled from obtaining his subsistence by manual labor, were false. In support of the application made in 1905 one Arthur Keyes made an affidavit in the following language:

"General Affidavit.

"State of Kansas, County of Wyandotte—ss.:

"In the matter of the pension claim of Jesse Blunt, who was hurt at Ft. Leavenworth in the year 1895 and 1896.

"On this 26th day of April, A. D. 1906, personally appeared before me, a notary public in and for the aforesaid county, duly authorized to administer oaths, Arthur Keyes, aged 29 years, whose post office address is 1110½ North Ninth street, Kansas City, Kan., well known to be reputable and entitled to credit, and who, being duly sworn, declares in relation to the aforesaid as follows: I was soldiering in same troop at Ft. Leavenworth, Kan., with said Blunt at same time he was hurt. On the day his eye was hurt he was chopping bales in the barn. I was stable orderly, was standing near, and saw the wire when it bursted and hit him in the eye. Also on the 20th day of January, 1896, he was cutting willows to make a hurdle for the riding hall, and the ax glanced and hit him on the knee, and split his knee cap, and left his knee stiff.

"I further declare that I have no interest in said case and am not concerned in its prosecution. Arthur Keyes."

(Jurat omitted.)

Blunt's connection with the making of the affidavit by Keyes is shown by the following questions and answers appearing in the record:

"Q. Do you know Arthur Keyes? A. Yes, sir. Q. Did you request him to make an affidavit in support of your application for a pension? A. Yes, sir. Q. Did you cause it to be transmitted to the United States Commissioner of Pensions? A. I wrote and asked him if he would make an affidavit."

These questions were asked by his counsel. The following questions were asked by the court:

"Q. Do you know Arthur Keyes? A. Yes, sir. Q. Did you request him to make an affidavit in support of your application for a pension? A. Yes, sir. Q. Did you cause it to be transmitted to the United States Commissioner of Pensions? A. I wrote and asked him if he would make an affidavit. That is all there is of it."

Cross-examined by counsel for the railroad company, he testified as follows:

"Q. Who was Arthur Keyes? A. He was a private soldier in the same troop and regiment in the United States service. Q. One of your fellow troopers? A. Yes, sir. Q. Where did he live at the time you applied for a pension? A. I think in Kansas City. Q. You testified before you asked him to make an affidavit in support of your application for a pension? A. I asked him if he would make one, if he knew anything. I wrote that. Q. Did you write that personally? A. Yes; I will not be positive whether I did or not. It was done through me anyway. Q. Who was conducting the correspondence for you? A. Judge Archer was transacting the business for me. Q. Do you

know whether or not he wrote Mr. Keyes? A. Well, I or him, one did. I am not positive. Q. Did Judge Archer tell you he got Mr. Keyes' affidavit and forwarded it to the Pension Office? A. I think he did. Q. He was making whatever proof you could furnish and whatever the Pension Office was calling for, for the purpose of proving up your claim, was he? A. Just what he knew. Q. I mean Judge Archer was conducting the correspondence for you at Plattsmouth? A. Yes, sir. Q. Do you think he advised you that in your behalf he received the Keyes affidavit? A. I would not be positive, but I think he did. Q. Did you ever see the affidavit? A. I think not. I wouldn't be positive. Q. When you wrote to Mr. Keyes, requesting him to make the affidavit, did you suggest to him what disabilities you were relying on to get your pension? A. It seems as though I wrote and asked him if he remembered about the time that I fell on the hand ax and about the time I got the varicocele and my eye hurt. Q. Did you receive a reply from him? A. I don't just remember. A reply came. I don't remember whether it came direct to me or to Judge Archer."

[1] On this state of the record, counsel for the railroad company requested, and the court refused to give, the following instruction:

"No. 4. You are further instructed that the laws of the United States which were in force during the years 1905, 1906, and 1907, when the plaintiff made the two declarations for the purpose of securing an invalid pension from the government of the United States, and when he made the affidavits in support of such declarations and which have been offered in evidence, and when he procured the making of an affidavit by one Arthur Keyes in support of his said applications for a pension, which affidavit is in evidence, provided that every person who knowingly or willfully makes or aids or assists in making, or in any wise procures the making or presentation, of any false or fraudulent affidavit or declaration concerning any claim for a pension, shall be punished by fine or by imprisonment. If you find from the evidence that the plaintiff knowingly or willfully made or aided or assisted in making any false or fraudulent affidavit or declaration for the purpose of procuring a pension, or that he in any wise procured the making or presentation to the United States Commissioner of pensions of a false or fraudulent affidavit by any other person, then you may consider such facts as bearing upon the credibility and weight to which the testimony of the plaintiff is entitled in this case."

We think this request was properly refused, for the following reasons: The first clause of the request is, for all practical purposes, an instruction that Blunt procured the making of a false and fraudulent affidavit by Keyes in support of his applications for a pension. We say this for the reason that the request states without qualification that Blunt procured the making of the Keyes affidavit, and then this language is followed by a statement that the law at the time that affidavit was made provided that every person who knowingly or willfully makes or aids or assists in making, or in any wise procures the making or presentation of, any false or fraudulent affidavit or declaration concerning any claim for a pension, shall be punished by fine and imprisonment. The first clause of the request is simply preliminary to the direct charge contained in the last clause, but whatever the court stated as a fact was just as prejudicial to the plaintiff as if it had been given in a direct charge to the jury. The request, therefore, if given, would have taken away from the jury the right to determine whether, upon the evidence as it then stood, Blunt could be said to have procured the making of the Keyes affidavit, within the meaning of section 4746, R. S. U. S. (U. S. Comp. St. 1901, p. 3279).

[2] We now come to the last clause of the request, where, if given, the jury would have been charged that, if they should find from the evidence that Blunt in any wise procured the making or presentation to the United States Commissioner of Pensions of a false or fraudulent affidavit by any other person, then they might consider such facts, etc. This language, in connection with the first clause of the request, would practically take from the jury the right of deciding on the evidence whether Blunt procured Keyes to make the affidavit set out in this opinion, for the reason that there was no other evidence that Blunt procured the making of an affidavit other than the one made by Keyes.

[3] The language quoted from the second clause of the request was also erroneous for the reason that there was nothing in Keyes affidavit, or in the record, for that matter, to show that it was either false or fraudulent, and therefore the language used in the last clause of the request was not applicable to any state of facts in the record.

Section 4746, R. S. U. S., which was the law in force at the time the Keyes affidavit was made, punishes the procuring of the making of any false or fraudulent affidavit. It does not punish the procuring of the making of an affidavit which is not false and fraudulent, although it may be used in support of a fraudulent pension claim. We think the request was wholly misleading, and would have been very prejudicial to the rights of the plaintiff.

The only other error assigned is that the court erred in refusing to direct a verdict for the defendant, but this assignment is not seriously urged.

The judgment below must be affirmed; and it is so ordered.